No. 18,511.

HESTER S. ROMARY, Revived in the Name of MAUD WHALEY et al., *Appellees*, v. J. F. ROMARY et al., *Appellants*.

SYLLABUS BY THE COURT.

FAMILY SETTLEMENT — *Advancements* — *Oral Agreement by Youngest Son for Maintenance of Parents—Partial Execution of Agreement—Death of Parents—Equitable Rights of Youngest Son*. The owner of land gave the possession of an eighty-acre tract and a team to each of his children as they respectively attained to majority, with the understanding and agreement, participated in by their mother, that they should have the title at the father's death. It was also a part of the parents' plan that the youngest son should remain on the homestead of 120 acres and have the title to it when they died. The older children occupied and improved their respective tracts. The youngest son was still a minor when his father died. A family settlement was then agreed upon to carry out the original plan. The rights of majority were conferred on the minor that he might enter into the agreement. The sons and daughters conveyed all their interests in all the land to their mother. She conveyed to each of the older ones the tract occupied by him or her respectively, and made a will, which she promised not to change, devising the homestead to the youngest son at her death upon his agreement to care for her on the farm while she lived. The agreement was verbal but was faithfully carried out until the youngest son married, when unhappy differences arose causing strife and ill feeling between the mother and the son's wife, and also between the mother and son, in which

Romary v. Romary.

harsh and reproachful language was used by all three, cul-
minating in the withdrawal of the mother from the home-
stead. In a suit by the mother against the son to set aside
the contract, which was verbal, and to quiet her title to the
home, based upon his alleged default, and the charge that
because of the unkindness of the son and his wife she could
no longer live with him, the district court found generally
for the mother. Judgment was entered quieting her title to
the homestead and for the recovery of one-half the crops
raised after she left it, upon her paying $2500 to the son.
Afterwards the mother died. It is held, after reviewing the
facts and evidence, that in view of the changed conditions
caused by the death of the mother, the agreement should be
specifically performed as near as may be, by vesting the title
of the homestead in the son upon his paying one-half the
value of the crops, as before adjudged, in lieu of her support
from the time she left the homestead, and also the expenses
of her funeral, and that the judgment should be modified
accordingly.

Appeal from Coffey district court; FREDERICK A.
MECKEL, judge. Opinion filed January 10, 1914.
Modified.

*J. I. Wolfe,* of Burlington, *E. R. Evans,* of Lebo, and
*R. M. Hamer,* of Emporia, for the appellants.

*W. L. Huggins, Humbert Riddle, H. E. Ganse,* all of
Emporia, and *L. H. Hannen,* of Burlington, for the
appellees.

The opinion of the court was delivered by

BENSON, J.: This is an action to set aside a family
settlement and to quiet the title of a widow to a tract
of land against the claims of one of her sons.

Edward W. Romary died intestate, leaving six chil-
dren and a wife, his only heirs. Frank, the youngest
child, was nineteen years old and is the defendant.
His brothers and sisters were of full age. His mother,
the plaintiff, was sixty years of age then—sixty-five
at the time of the trial. Edward Romary owned 500

acres of land in Coffey county, and when each child reached majority he placed him or her in possession of eighty acres of this land and also gave a team to each, with the understanding between the parents and children that the title to the land should eventually follow the possession, and improvements were made by each of them accordingly. It was also understood that Frank was to have the homestead of 120 acres at the death of his parents. Upon the death of the father, Frank returned home from the State Agricultural College, where he was a student, and an oral agreement was made between the widow and children, intended to carry out the original plan, by which the title to the eighty-acre tract of which each child was still in possession should be transferred to him or her; that the mother and Frank should occupy the homestead where he should care for her during her life and have the place at her death. To make this agreement effectual an application was made to the district court to confer upon Frank the rights of majority, which was done, and on November 1, 1906, all the children made conveyances of all their interests in the lands, including the homestead, to the mother. She in turn made a conveyance to each son and daughter of the eighty-acre tract occupied by him or her, but held the title to the homestead, which she devised to Frank by her will, which she deposited with the probate judge, promising Frank that she would not change it. Frank then gave up attending school and remained with his mother upon the homestead. The father left about $500 worth of personal property which was used by Frank and his mother on the farm, and out of it Frank paid expenses of his father's funeral, about $100, and erected a monument at his grave. After a time the farm was leased. The mother and son lived together pleasantly until Frank's marriage, which occurred on December 27, 1909. When he brought his wife home his mother met them at the door, and after greetings

said that another son and daughter, naming them, had told her that they would never darken her doors while Frank's wife, Bernice, lived there. · It appears that they were hostile to the marriage. Soon after Bernice came it was arranged that the tenant of the farm should occupy the lower floor of the dwelling house, which contained eleven rooms, and the mother and Frank and his wife the upper floor. In June after the marriage the mother criticized Bernice for buying a $4.50 hat, and told Frank in her presence that such extravagance would send him to the poorhouse. This led to ill feelings and caused distress to Bernice. Later when she was working in the flower bed, and two little children of the tenant were with her, the mother came out and complained of her conduct in allowing the children to be with her, and directed her to order them away. This incident increased the ill feeling. Some controversy also occurred about the cooking, causing distress to both. Trouble about other domestic matters followed. Frank tried to compose these difficulties, but they still continued at intervals about rather trifling matters, the details of which it is not necessary to state. In September, 1910, because of the expected birth of a child, Bernice's mother came to remain for a time with her daughter. Frank's mother accused him of thinking more of his mother-in-law than of her, and he retorted by saying, in substance, that she treated him more like a mother than his own mother did. About a month after Bernice's mother came, Mrs. Romary, the plaintiff, went away to Arkansas and Oklahoma and remained until January, 1911. On her return different arrangements about the farm were discussed. She offered to lease the farm to Frank for $200 per year, he to live on the lower floor of the house. He was willing to take such a lease provided a clause was inserted in it that he should have the farm at her death. She made an offer to pay him $2500 for his interest, and he offered to take $3000. No agreement

was reached. She then requested him to send his mother-in-law away, which he refused to do, and requested her not to make any trouble with his wife or go to her room, because of her delicate condition. Mrs. Romary left the homestead at or soon after her return from Oklahoma. The mother-in-law left in April, 1911, the child having been previously born.

Mrs. Romary took her will from the probate office and destroyed it just before leaving for Arkansas. She had previously changed it by making the devise to Frank and the heirs of his body.

There was evidence of harsh and reproachful language used by Frank and his wife when differences between the mother and wife were being discussed. At one time he became angry over an April fool joke of his mother and used profane and contemptuous language. The mother used reproachful and unkind language towards the young people, and made charges of infidelity against Bernice. She testified that harsh words were spoken by all three. With respect to these unkindnesses, the age and physical condition of the mother and the son's duty of forbearance should be remembered; on the other hand, the situation and condition of the young wife, and his duty to protect and care for her so far as he could honorably do so should be borne in mind.

There is some complaint that the mother received but little of the proceeds of the farm for her personal use, which is true. She also complained that she was not strong and that the assistance of a girl in the household was promised and should have been provided. It seems that at one time a girl was engaged, but was soon discharged by the mother, and that Frank assisted in washing and other work in the home. On the whole, without stating further details, it is believed that these minor matters would never have been the grounds of serious complaint had not the difficulties following the advent of the son's wife into the home led to the dis-

Romary v. Romary.

agreements between the mother and her daughter-in-law and the final rupture which followed. The mother loved her son fondly, and expressed her feelings about the new situation in her testimony, saying: "He ceased to love his mother and he loved his wife so well that he had no room for his mother."

The district court made no special findings, but found generally for the plaintiff, set aside the contract and quieted the plaintiff's title to the homestead; adjudged that she should recover half the crops of the farming season beginning March 1, 1911, and have possession January 1, 1912, but that Frank should recover from her the sum of $2500, which was made a lien upon the land. This judgment was entered December 1, 1911.

It is obvious that these conclusions were reached upon finding that because of the ill feeling and strife engendered between the plaintiff and the young wife it was not possible for them to live happily together, and that therefore the agreement could not be specifically performed. Hence its annulment and the allowance made to Frank of a sum doubtless deemed equitable by the district court in the situation then presented, and the provision out of the crops for her support after she left the homestead until she should obtain possession. The court probably considered the expectation of life of the mother at that time and directed the payment of a sum deemed equivalent to the son's interest in the land, charged as it was with her support for the remainder of her life. The evidence is that the 80-acre tracts were each worth about $1900 when possession was taken by the other children, but the dates of possession were not shown. The value of the homestead at the time of the trial was shown to be $6000 and its rental value $200 to $250 per year. The mother died June 21, 1912.

It is argued that Frank will obtain by the judgment $500 more than his brothers and sisters, but it must be remembered that they have had the use of their land

since majority, and it may fairly be presumed that the lands have increased in value meanwhile. The present value of these lands might have afforded the district court additional information in settling the decree. However, this court believes that it is its duty now to dispose of the case in the situation existing at this time, changed as it is by the death of Mrs. Romary. A careful consideration of values and the probable expense of caring for the mother are not so important now. It was the intent of all concerned that Frank should have the homestead upon his leaving school and caring for his mother. It is not reasonable to suppose that it was intended that he should remain single, nor could it have been anticipated that his marriage would cause a rupture in the home. His kindness to his mother before his marriage is not questioned, nor indeed afterwards except at times of altercation between his mother and his wife. The repetition by the mother of what other members of the family had perhaps thoughtlessly told her, showing their hostility to Frank's wife, at the moment of her entrance into the household was most unfortunate. Petty quarrels and hasty accusations followed. True, the son should not have allowed anything to cause him to speak a harsh or angry word to his mother, but his wife was also entitled to his solicitous care—especially when her own motherhood was approaching. There was a lack of mutual forbearance. Mindful as we all must be of the common frailties of human nature, may we not pity rather than harshly condemn the members of this unhappy household? Shall we not, so far as safe procedure will permit, condone faults and carry into effect the good intentions of all, temporarily defeated by resentments born of an imperfect understanding of each other's motives?

The will has been cancelled. The mother is dead. The other children have secured and for years enjoyed all that the father and mother intended they should have and just what they agreed to accept. The home-

stead alone remains for disposition. It was the cherished purpose of the father, which the agreement was designed to effectuate, that his youngest son should have the home, subject only to the care of his mother, but death has canceled that sacred charge so far as the future is concerned, and no obstacle now remains to prevent carrying out the plan as the parents intended, and as all the parties agreed, with such provisions relating to the mother's care after she left the home as may be equitable. It is concluded that this can better be done now by a specific performance of the agreement, upon the conditions just stated, rather than by giving Frank a sum of money and a release from the obligation of support, as the district court directed in the circumstances existing at the time of the trial.

To accomplish this end the judgment should be modified by vesting the title to the homestead in the defendant, J. F. (Frank) Romary, and quieting that title upon his paying, in lieu of her support after leaving the home, one-half the value of the crops raised upon the farm for the farming seasons of 1911 and 1912 and the expenses of the funeral of his mother, if he has not already done so. These amounts will probably be fixed by agreement, but if not they will be determined by the district court. Costs in that court will be taxed in its discretion. The costs in this court will be divided.

The cause is remanded for modification of judgment as directed.